Collins, Judge,
delivered the opinion of the court:
The Department of the Air Force, in September 1958, awarded to plaintiff a contract for the transportation of passengers between Charleston, South Carolina, and Nouas-seur, Morocco. 'Subsequently, after plaintiff had been performing for more than 2 months, the Air Force canceled the contract on the ground that the award to plaintiff had been invalid. In this action, plaintiff charges that the cancellation constituted a breach of contract; plaintiff seeks to recover its unreimbursed expenses and, in addition, anticipated profits.
The pertinent facts can be summarized as follows: On August 13,1958, the Military Air Transport Service (hereinafter “MATS”) issued invitations for bids regarding 13 items of airlift service. One of these items, No. 7, is involved in the present suit. Only “small business firms” were permitted to bid with regard to item 7. Finding 6, infra. The bid opening was held on September 4, 1958. Three firms submitted bids which were lower than plaintiff’s. Before the contracting officer could make an award, he was required to obtain from the MATS Capability Survey Committee a recommendation as to the qualifications of the low bidders.
On September 11th, the committee issued a negative report as to each.of the three lowest bidders. The contracting officer accepted the committee’s recommendation that the three *261 low bids be rejected. Moreover, the contracting officer stated that he had decided to (1) find that a condition of urgency existed, (2) issue a certificate to that effect, and (3) proceed with the procurement without referring the rejected bids to the Small Business Administration.[1] Thereafter, it was determined that plaintiff was capable of providing the needed transportation. On September 18, 1958, the contracting officer notified plaintiff, by telegram, that it would be awarded the contract.
As a result of protests by the companies whose bids had been rejected, investigations were commenced by the Air Force and by the General Accounting Office (hereinafter the “GAO”). One alleged irregularity related to the preparation of the certificate of urgency. The investigations disclosed that the contracting officer had not executed the certificate until September 25, 1958, although he had dated it September 14,1958.
On October 24, 1958, the GAO issued an opinion to the effect that (1) since the certificate of urgency was issued subsequent to the award of the contract to plaintiff, such certificate was invalid and (2) therefore, the low bidders were entitled to have their capacity judged by the Small Business Administration (hereinafter the “SBA”). On December 9, 1958, after the SBA had determined that Los Angeles Air Service, Inc. (hereinafter “Los Angeles”), the second lowest bidder, was qualified to perform, the GAO *262 ruled that the rejection of the bid of Los Angeles had been erroneous. The GAO directed the cancellation of the award to plaintiff and this was accomplished on December 18,1958. On the same date, the contract was awarded to Los Angeles,[2]
Upon receipt of the notice of cancellation, plaintiff ceased performance of the contract. Subsequently, plaintiff submitted a claim to the GAO. After the denial of its claim, plaintiff instituted the present suit.
The initial question is whether the award to plaintiff was invalid. Defendant contends that the contracting officer violated the applicable regulations when he failed to refer to the SBA the matter of the competency of Los Angeles and of the other low bidders. Therefore, according to defendant, the subsequent award of the contract to plaintiff was illegal. We do not agree with the assertions of defendant.
First, it must be noted that referral to the SBA was not required' in every instance when the bid of a small business concern was rejected for lack of capacity or credit. The pertinent regulation, ASPE. § 1-705.6, provided, in part, as follows:
* * * this procedure [z.e., submission to the SBA] is mandatory except where the contracting officer certifies in writing that award must be made without delay and inserts in the contract file a statement signed by the contracting officer justifying the certificate; (Emphasis supplied.)
Here, the contracting officer, acting in good faith, sought to come within the terms of this exception.[3]
Defendant argues that, at the time of the award, there was no need to proceed without delay. Thus, defendant asks us to declare that the contracting officer erred when he deter *263 mined that a condition of -urgency existed.[4] We can assume that, under appropriate circumstances, a court could overturn the decision of a contracting officer that an award must be made without delay. However, this is not a case where interference with the discretion of .the contracting officer would be proper.
The rejection of the low bidders took place at the meeting held on September 10-11, 1958. Finding. 12,- m/m'. Thus, at that point, it became necessary for the contracting officer to determine whether to submit the matter to the SBA. In light of the existing conditions, we cannot say that the decision reached by the contracting officer was either unreasonable or improper.[5] For example, the Air Force desired the airlift service to begin by October 1, 1958, and this left a relatively short time for completing award of the contract and commencing performance. Therefore, we conclude that the contracting officer did comply with the regulations and that award of the contract to plaintiff was proper and valid. Cf. John Reiner & Co. v. United States, 163 Ct. Cl. 381, 387, 325 F. 2d 438 (1963), cert. denied, 377 U.S. 931 (1964). It follows that plaintiff is entitled to recover.
As to the proper theory of recovery, our decision in Reiner, supra, is relevant. In Reiner, as in the present case, the plaintiff’s contract was canceled as the result of a GAO ruling that the award was improper. We held that the award to Reiner was not void, but was lawful. 'Slip. op. p. 4. However, Reiner’s recovery was limited to that provided for .in the termination-for-convenience clause. Thus, there was no entitlement to such items as unearned anticipated profits. This court stated, p. 392, the following;
* * * The contracting officer on plaintiff’s contract probably thought that he was cancelling the agreement for illegality. That excuse was not a valid justification *264 as we now know, but just as in College Point Boat Corp. [267 U.S. 12 (1925)] a good ground did exist.in the far-reaching right to terminate under the termination-article. That justifiable cause controls the case and. “operate[s] to curtail the damages recoverable” * * *.
The majority opinion went on to point out, p. 393, that:
Just as the failure to invoke the termination article leaves untouched the defendant’s right to rely on the damage limitation of that clause, so the failure to follow the termination procedures of the Armed Services Procurement Regulations (ASPR) is ineffective to broaden plaintiff’s rights of recovery. * * * Unless the contractor can show that he has been injured by the failure to pursue the ASPR procedures, such a lapse is immaterial to his recovery. * * *
We found that Reiner had not been hurt by the informal procedures and, as indicated, the judgment was restricted to the amount collectible on a termination for convenience.
With regard to the case at bar, we are bound by the reasoning of John Reiner & Co. v. United States, supra.[6] Here, as in Reiner, the Government may rely upon the termination-for-convenience clause despite the fact that the contracting officer did not invoke the clause. See also Brown & Son Electric Co. v. United States, 163 Ct. Cl. 465, 472, 325 F. 2d 446 (1963); Nesbitt v. United States, supra, footnote 6. Therefore, plaintiff’s recovery is to be measured by the termination article.[7]
Determination of plaintiff’s award can properly be accomplished in proceedings before our trial commissioner. In a case of this type, there is no requirement under the contract *265 or under the Wunderlich Act, 68 Stat. 81 (1954), 41 U.S.C. §§ 321-22 (1958), that the recovery be computed administratively (i.e., within the Department of Defense). Brown & Son Electric Co. v. United States, supra, p. 472. Cf. Stein Bros. Mfg. Co. v. United States, 162 Ct. Cl. 802, 808, 337 F. 2d 861 (1963).
In conclusion, we hold that plaintiff is entitled to recover an amount to be computed in accord with the termination-f or-convenience article.[8] This amount will be determined in proceedings pursuant to Rule 47 (c).
Defendant filed a counterclaim based upon the alleged illegality of plaintiff’s contract. As indicated by the above opinion, there is no merit in the counterclaim and it is dismissed.
BINDINGS OP PACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff, Coastal Cargo Company, Inc., is a small business firm within the meaning of the Small Business Act, incorporated under the laws of the State of New Jersey and engaged in the business of air transportation of passengers and cargo in interstate and foreign commerce, with its base of operations at the Mercer County Airport, West Trenton, New Jersey. (After the filing of the petition herein, Coastal’s corporate name was changed to Coastal Airlines, Inc.)
2. In the summer of 1958, Congress appropriated a large sum of money for procurement of commercial airlift services by the Air Force. About that time the commercial airlift procurement work was transferred from the Air Materiel Command (AMC) at Wright-Patterson Air Force Base, *266 Ohio, to Headquarters, Military Air Transport Service (MATS) at Scott Air Force Base, Illinois, and certain AMO personnel were transferred to Scott to handle this procurement work. However, MATS had only been granted approval authority for contracts under $350,000, and any contract in excess of $850,000 had to be approved by AMC.
3. At Scott the MATS chain of command for procurement work was as follows:
Deputy Chief of Staff for Materiel (DCS/M) — General Light
Asst. Deputy Chief of Staff for Materiel — Colonel Sloan (acting DCS/M in General Light’s absence)
Chief of Procurement Division — Colonel Sherman
Chief of Contract Airlift Section — Lt. Colonel Bores
Contracting Officer — Robert F. Hinger
4. After the transfer of commercial airlift procurement work to Scott, a permanent Commercial Airlift Capability Survey Committee was established to evaluate the capability of bidders and to report its evaluations to the contracting officer for his decision. Colonel Sloan was the Chairman of the Capability Survey Committee.
AMC had a Facility Capability Committee which issued Facility Capability Reports on bidders, but the Facility Capability Report procedure applied primarily to manufacturing activities, whereas the MATS Capability Survey Committee procedure was set up strictly for commercial airlift procurements. The Capability Survey Committee procedure at MATS was mandatory, and the contracting officer could not take any action until he received the findings and recommendations of that committee.
5. The purpose of the Capability Survey Committee was “to evaluate the capabilities and qualifications of proposed commercial airlift’ contractors.” Its procedures were set forth in instructions, dated July 24,1958, which provided as follows:'
' a. Prior to the award of a contract to a prospective airlift contractor the chairman of the committee may call upon the designated members to evaluate the capabilities of the prospective contractor. The evaluation will consist of but will not be limited to past performance; financial resources; equipment; personnel; technical know- *267 bow; maintenance capability and support capability. If an actual facility survey is required as the result of this initial evaluation, the chairman will direct designated members to perform an evaluation of the prospective contractors’ facilities. The survey will consist of but will not be limited to inspecting the quality of workmanship (maintenance); minimum, maximum, current and potential capabilities, financial prospectives, plant layout for maintenance of aircraft, condition of aircraft to be under the performance of the proposed contract, condition of ground handling equipment, and such other items that affect carrier capability.
6. On August 13, 1958, MATS issued Invitations for Bids (IFB) 11-626-59-3 CAB for 13 items of overseas passenger and cargo airlift services for the period October 1, 1958, to September 30,1959. Items 6, 7, 8, and 9 of this IFB were set aside for awards to small business firms only, pursuant to 10 U.S.C. § 2304(a) (1) and sections 1-706.7 and 3-201.2(b) (ii) of the Armed Services Procurement Regulations. This was the first airlift procurement program regarding which MATS had provided a “set-aside” for small business firms.
Item 7 was for the transportation of 500 passengers per month, round trip, from Charleston Air Force Base, South Carolina, to Nouasseur, Morocco. Items 6, 8, and 9 related to different destinations and to different points of origin.
7. The IFB provided that bids were to be submitted by September 2,1958, and would be opened that day. Bid opening was later postponed until September 4, 1958. The procurement plan for the IFB estimated the date of award as September 15, 1958. When bids were opened on September 4,1958, the lowest bids received on Items 6, 7, 8, and 9 were as indicated in the following tabulation:

Item 6:

(1) Universal Airlines (SSW, Inc. d/b/a), Burbank, California_ $157.87 per round trip passenger.
(2) Capitol Airways, Inc., Nashville, Tennessee_ $167.14 per round trip passenger.

Item 7:

(1) General Airways, Portland, Oregon - $206.19 per round trip passenger.
(2) Los Angeles Air Service, Inc., Hawthorne, California_ $215.08 per round trip passenger.
(3) Universal Airlines (SSW, Inc. d/b/a), Burbank, California_ $218.70 per round trip passenger.
(4) Coastal Cargo Co., Inc., West Trenton, New Jersey_ $222.90 per round trip passenger.

*268
Item 8:

(1) Slick Airways, Inc., Burbank, Califomia_ $320.16 per round trip passenger.

Item 9:

(1) Los Angeles Air Service, Inc., Hawthorne, California-$3-19.62 per round trip passenger.
(2) Slick Airways, Inc., Burbank, California_ $378.88 per round trip passenger.
Coastal submitted bids on Items 6 and 7, and another small business firm, Los Angeles Air Service, Inc. (plaintiff in the companion case of Trans International Airlines, Inc. (formerly Los Angeles Air Service, Inc.) v. United States, Ct. Cl. No. 271-60), submitted bids on Items 7 and 9.
8. On the day bids were opened, Mr. Hinger, the contracting officer, requested the Capability Survey Committee to determine if the low bidder on each item was capable of performing, and, if the capability of the low bidder was questionable, to evaluate the second low bidder. For Item 7, the names of General Airways and Los Angeles were submitted to the committee, and for Item 9, the names of Los Angeles and Slick Airways.
Upon receiving the request from the contracting officer, the Capability Survey Committee met on September 4,1958, and organized four teams to visit the different bidders.
9. Los Angeles and Universal Airlines were each surveyed on September 7 and 8,1958. General Airways was surveyed at approximately the same time. During the second week of September 1958, a survey was made of Coastal.
The teams submitted their findings to the Capability Survey Committee which then met to make findings and recommendations to the contracting officer.
10. The Capability Survey Committee held a meeting which began during the afternoon of September 10, 1958, and continued until the morning of September 11, 1958. In a report dated September 11,1958, the committee found that Los Angeles was not capable of performing because of its financial condition, because there was no record of performance by the bidder with the type of aircraft upon which the bid was based, and because of failure to establish possession or control of necessary maintenance spares or back-up capability. The committee recommended that the bids of Los Angeles on Item 7 and Item 9 be rejected. On the same day, *269 September 11, 1958, the committee determined that General Airways and Universal were not capable of performing and recommended rejection of tbeir bids. These recommendations were accepted by the contracting officer.
11. Section 1-705.6 of the Armed Services Procurement ¡Regulations (ASPE), revised June 11, 1958, provided as follows:
1-705.6 Certificates of Competency.
(a) SBA bas the statutory authority to certify the competence of any small business concern as to capacity (see ASPE 1-307 (iii) and (iv)) and credit (see ASPE 1 — 307(ii)). Contracting officers shall accept SBA certificates of competency as to capacity and credit as conclusive ; provided, if the contracting officer has substantial doubts as to the firm’s ability to perform, he shall prior to award refer the matter to higher authority in accordance with Departmental procedures.
(b) If a small business concern has submitted an otherwise acceptable bid or proposal but has been found by the contracting officer to be nonresponsible as to capacity or credit, and if the bid or proposal is to be rejected for this reason alone, (i) SBA shall be notified of the circumstances so as to permit it to issue a certificate of competency, and (ii) award shall be withheld pending either SBA issuance of a certificate of competency or the expiration of teapworking days after SBA is so notified, whichever is earlier; subject to the following:
(A) this procedure is mandatory except where the contracting officer certifies in writing that award must be made without delay and inserts in the contract file a statement signed by the contracting officer justifying the certificate;
(B) this procedure does not apply to proposed awards of not more than $1,000; and
(C) this procedure is optional, within the discretion of the contracting officer,, as to proposed awards of more than $1,000, but less than $10,000.
The Air Force Procurement Instructions (AFPI), revised April 22, 1958, pertaining to Negative Facility Capability Eeports on Small Business Concerns, provided, in section 52-109 (f), a mandatory procedure-for referring small business concerns to the Small Business Administration for a certificate of competency, with the following exception:
(5) The proceedings outlined above are mandatory except where the award must be made without delay (see *270 ASPE 1-705.6 (b) (A)). In such case tbe contracting officer will:
(A) Make a written certification and justification for awarding tbe contract without delay.
(B) Place tbe certification in tbe contract file.
(C) Notify tbe AF small business specialist at tbe procuring location that the award must be made without delay and that be is proceeding with the procurement.
12. During tbe meeting of tbe Capability Survey Committee on September 10-11, 1958, a question arose about tbe submission of these small business bidders to tbe Small Business Administration (hereafter referred to as SBA) for a determination of competency as to capacity and credit. Prior to that time, Colonel Sloan, tbe chairman of tbe Capability Survey Committee, was not aware of tbe requirements of tbe small business regulations. By this time the Capability Survey Committee bad reached an impasse, because tbe target date for awards was September 15,1958, and tbe SBA procedure for processing certificates of competency required about 10 working days. An exception to the requirements of tbe applicable regulations in situations of urgency was pointed out by Colonel Adams, who read tbe appropriate provisions of tbe regulations aloud to members of tbe committee, to Mr. Hinger, and to Captain Horn (the MATS Executive for Small Business). The Capability Survey Committee informally recommended to Mr. Hinger, the contracting officer, that tbe rejected low bidders not be referred to SBA. Mr. Hinger then announced that be had decided to (1) find that a condition of urgency existed, (2) issue a certification to that effect, and (8) proceed with tbe procurement without referring the matter to SBA for its determination.
13. The “urgency” involved in this procurement problem arose because of lack of adequate time to complete the usual procedural requirements by the target date. This was a highly compressed procurement assignment timewise, because (1) the issuance of the IFB was delayed by late passage of the appropriations bill, (2) the Air Force desired the airlift services to begin by October 1, 1958, and (3) a large volume of work was required in processing such procurement, involving approximately $17 million. Because of *271 the delays 'and the shortness of time, there were discussions of starting the contracts later or handling the passenger service for an additional month on a call basis or by use of MATS planes, but none of these alternatives was adopted. The urgency pertained to the procurement as a whole and was not limited to any specific item or items.
14. On September 12, 1958, the Capability Survey Committee met, found that Coastal was capable of performing, and recommended that Item 7 be awarded to Coastal.
15. After the Capability Survey Committee’s findings and recommendations were made to the contracting officer, much work remained to be done before submission to and approval by AMC.
16. The proposed contracts were taken to AMC for approval in two groups, the “large packages” (larger awards, non-small business items) of this procurement going first and the “small packages” (smaller awards, small business '“set-aside” items) going to AMC about a week later. The larger awards, which were taken to AMC first in order to give MATS at least a partial capability for its commercial airlift needs, were approved and returned from AMC on Friday, September 12,1958.
17. On or about Monday morning, September 15, 1958, Colonel Sloan and Mr. Hinger took the second group of proposed contracts to AMC.
Before being sent to the AMC Procurement Committee, a proposed contract had to be given financial clearance at AMC. The AMC Financial Office denied financial clearance for Los Angeles on September 16, 1958, for Item 9 for the estimated amount of $6 million. The request for financial clearance on Coastal for Item 7 for the amount of $1.3 million was approved by AMC on September l7, 1958.
18. The award on Item 9 to Slick Airways was publicly announced on September 16, 1958, and on the next day, Los Angeles protested to MATS that it had been improperly eliminated on grounds of financial incapacity. On September 18,1958, a Los Angeles representative conferred with Lt. Colonel Bores and showed him a statement from the Bank of America guaranteeing the president of Los Angeles a loan of $1 million, but he was told that the award had already *272 been officially made. On the same day, the Comptroller’s Office at MATS reevaluated Los Angeles’ financial capability as to Item 9 and again concluded Los Angeles was not financially capable of performing.
19. On September 18, 1958, the contracting officer notified Coastal by telegram that it was the low bidder on Item 7 and that the official award would be forwarded as soon as necessary approvals were received. On the same day, Coastal began its preparations to perform. On September 22, 1958, Coastal received an award dated September 16, 1958, for air transportation of 500 passengers per month, October 1, 1958, to September 30, 1959, round trip from Charleston, South Carolina, to Nouasseur, Morocco, at $222.90 per round trip passenger, for, a total amount of $1,337,400.
General Airways, the first low bidder on Item 7, had been rejected because of its prior performance record on another contract; Los Angeles, the second low bidder, had been rejected principally for inadequate finances; Universal, the third low bidder, had been rejected for inadequate finances.
20. Thereafter, Los Angeles contacted members of Congress with respect to the appropriate procedures to be followed in making a formal protest. On September, 23, 1958, Los Angeles filed a protest with the General Accounting Office (hereafter referred to as GAO) in regard to the award of Item 9 to Slick Airways, the second low bidder. Tins protest was also treated as a protest in regard to Item 7. The next day Universal filed a protest with the GAO in regard to the awards of Item 6 to Capitol Airways and Item 7 to Coastal. General Airways also filed a protest with the GAO in regard to Item 7. These protests were referred by the GAO to the Department of the Air Force for reports.
21. About the same time, the Department of the Air Force in Washington, D.C., was receiving complaints that applicable small business procedures had not been followed by MATS. These complaints were made to Mr. Gilbert C. Greenway, the Deputy for Air Transportation in the Office of the Assistant Secretary of the Air Force for Materiel. Mr. Greenway became concerned when definite allegations were made that small business procedures had not been followed and that a document might be missing.
*273 22. Mr. Greenway communicated Ms concern to Mr. Max Golden, then the Deputy Assistant Secretary for Materiel, and shortly thereafter the General Counsel of the Air Force. Mr. Golden was quite concerned about the charges that (1) files had been “stuffed” or (2) there was some irregularity with respect to the Small Business Administration procedures. At that time, the Department of the Air Force in Washington was unaware that the subject of capacity and credit of the small business firms had not been referred to SBA. It was decided that the MATS procurement people should be brought to Washington to explain the situation. On September 25, 1958, Mr. Greenway telephoned Colonel Sloan and told him to come to Washington for a conference the next day.
23. After receiving the call, Colonel Sloan held a meeting in General Light’s office. Colonel Sherman, Lt. Colonel Bores, Mr. Hinger, and Colonel Adams attended the meeting.
At the meeting, Colonel Sloan and Lt. Colonel Bores learned that the certificate of urgency was not in the files at that time.
After the meeting, Mr. Hinger prepared a certificate of urgency, backdated it September 14, 1958, and placed it in the contract files. The certificate stated:
I certify that because of the delay incurred prior to the release of IFB 11-626-59-3-CAB to industry, the late opening date, the time required for evaluation of bids, the facility checks and recommendations required of the Headquarters MATS Airlift Capability Survey Committee, the determination of the contracting officer, the preparation of the contract files and their processing through the Procurement Committee, Headquarters AMC; the necessity for the awards with the utmost expediency in order that schedules could be established, port calls made for passengers, cargo generated; in order to provide the carriers the minimum of time in which to properly prepare aircraft, position supply support, position all necessary personnel and make all other necessary operational arrangements; it is mandatory that awards must be made immediately. Any delay would adversely effect [sic] the entire MATS operation and the users i.e. the Air Force, Army and Navy.
24. The following day, the conference was held in Washington, attended by Colonel Sloan, Lt. Colonel Bores, and *274 Mr. Hinger from Scott, and by Mr. Golden, Mr. Greenway, a Lieutenant Landau from the Air Force General Counsel’s office, and one or more other persons from the Air Force headquarters.
During the conference on September 26,1958, Mr. Golden and Mr. Greenway learned that the MATS procurement officials had not applied to SBA for certificates of competency for the small business firms, whose bids were rejected for lack of capacity and credit. Mr. Golden Was told that a certificate of urgency had been executed and filed and that the applicable regulations had therefore been complied with. Mr. Hinger indicated to Mr. Golden that the certificate was not backdated.
25. Lt. Colonel Bores spoke privately to his superior, Colonel Sloan, about Mr. Hinger’s statement in regard to the certificate of urgency, and suggested that it should be corrected. Colonel Sloan felt it was unnecessary to take any action on the matter. Mr. Hinger’s statement was never, corrected during the period the MATS personnel were in Washington for this conference, and it was after the GAO investigation that Mr. Golden first learned that the certificate of urgency had been backdated.
26. At the conclusion of the conference, Mr. Golden directed Lieutenant Landau to prepare a draft of a report to GAO with regard to the protest of Universal. Colonel Sloan, Lt. Colonel Bores, and Mr. Hinger were directed to assist Lieutenant Landau. The completed report, which was dated September 29, 1958, and which was signed by the Assistant Secretary of the Air Force, stated, inter alia, that:
* * * In the present procurement the contracting officer determined that the awards could not be delayed for the time required by this procedure [submission to SBA], and on 14 September 1958 executed the necessary certificate setting forth the reasons for his determination. * * *
27. On October 3,1958, another report was made to GAO in regard to Los Angeles’ bid on Items 7 and 9. That report contained the same statement in regard to the certificate of urgency as the previous report on Universal’s protest and was based upon the same information obtained at the September 26 conference.
*275 28. In the meantime, GAO had received allegations about irregularities in the MATS procurement program and had initiated an investigation. The GAO investigation began at Scott on October 3,1958. The GAO investigator commenced by reviewing all the contract files on this IFB, with particular attention to Items 6,7, 8, and 9. The investigator found signed carbon copies of the certificate of urgency in the contract files on Items 6, 7, 8, and 9, but no other writings.
29. On October 6, 1958, the GAO investigator received from Washington certain protest letters from various rejected bidders and the report dated September 29,1958, from the Air Force on Universal’s protest.
30. Not having yet located the original copy of the certificate of urgency, the GAO investigator first interviewed Mr. Hinger on October 7,1958. The original of the certificate of urgency was located in a correspondence file.
31. On the basis of two interviews, the GAO investigator prepared an affidavit for Mr. Hinger’s signature. The affidavit, which was executed by Mr. Hinger on October 8,1958, stated, inter alia, that:
(7) The certificate [of urgency] was prepared and executed after award of contracts AF ll(626)-74 and AF ll(626)-75. During period September 14 through September 19, 1958, I made at least two trips to Air Materiel Command, Wright-Patterson AFB, Ohio. I arrived back from Wright-Patterson Field late at night of September 19th or early morning of September 20th 1958 and at that time I had not prepared the certificate. I did not discuss the need for a certificate while at Wright-Patterson AFB.
(8) The date of 14 September 1958 appearing on the certificate is retroactive in the sense that a handwritten draft was prepared after award of contracts AF 11 (626)-74 and 75. I arrived at the determination to issue a certificate of urgency about 10 September 1958, but this determination was not reduced to writing, even a long-hand draft, until 25th September. * * *
32. The GAO investigator submitted a report of his investigation and the information was transmitted to the General Counsel of GAO in Washington.
33. The Air Force Inspector General’s Office also investigated this procurement and the subject of a certificate of *276 urgency. As a result of the Air Force Inspector General’s investigation, Colonel Sloan, Lt. Colonel Bores, and Mr. Hinger were reprimanded by the Commanding General at Scott Air Force Base.
34. By decisions dated October 24,1958, GAO advised the Air Force that Los Angeles and Universal were entitled to a determination of their capacity and credit by SBA prior to rejection of their bids on such grounds, and that its concurrence in the validity of the awards under Items 6, 7, and 9 would depend upon whether these bidders were found by SBA to have been entitled to certificates of competency. The decision in the Los Angeles case referenced the decision in the Universal case.
In its opinion regarding Universal, the GAO stated that, since the contracting officer had not executed the certificate until after making the awards, he had violated the applicable regulations.
35. The October 24, 1958, GAO decision directed Los An-geles to furnish to the Air Force information relative to its capacity and credit as of September 16,1958 (the date of the award to Coastal), so the contracting officer could forward such information to SBA for a determination as to a certificate of competency. GAO directed Los Angeles to submit such data, because the evaluation of its facilities was apparently based to some extent upon the facilities of another company, the Capability Survey Committee having erroneously reported that Los Angeles owned helicopters. Los Angeles complied promptly.
On November 4,1958, the MATS Comptroller’s Office reviewed the financial status of Los Angeles to perform Item 9 and advised Colonel Sloan, the Chairman of the Capability Survey Committee that, based on the additional information, it was the Comptroller’s opinion that Los Angeles would be capable of performing.
36. By reports dated November 5, 1958, Mr. Hinger requested SBA to determine the capability and credit of Los Angeles and Universal and these reports were forwarded to SBA on November 10, 1958. SBA surveyed the facilities of Los Angeles and Universal, and on November 25, 1958, *277 advised the Air Force that it would have issued certificates of competency for these bidders had the question been referred to it prior to September, 16, 1958, and that, as of the current date, the bidders were competent as to capacity and credit — Los Angeles with respect to requirements under Item 7 and Universal for Item 6.
37. On November 26, 1958, the day following the SBA determination, the Air Force raised an issue with GAO as to the responsiveness of the bids submitted by Universal and Los Angeles in regard to Civil Aeronautics Administration (CAA) operating -certificates for DC-6 aircraft which they planned to operate. By decision dated December 9, 1958, GAO rejected the claim of the Air Force regarding non-responsiveness.
38. The decision of GAO concluded:
* * * that rejection of the bids submitted by Universal Airlines on Item 6 and Los Angeles Air Service on Item 7 was erroneous and that the contracting officer was, therefore, without authority on September 16 to award contracts based upon higher bid prices on these items to Capitol Airways, Inc., and to Coastal Cargo Company, Inc. * * *
GAO directed cancellation of the prior awards on Items 6 and 7.
39. On December 9, 1958, GAO rejected the protest of General Airways as to Item 7, upholding the rejection by MATS of the bid of General Airways because of prior unsatisfactory performance of other contracts.
40. On December 15, 1958, SBA advised the Air Force that Los Angeles was certified as competent at that time with respect to capacity and credit to perform the remaining portion of the procurement under Item 7. Because of recent adverse changes in the financial status of Universal, SBA declined to issue a certificate of competency to that company for Item 6. Since Universal was not granted a certificate of competency by SBA, the award to Capitol Airways under Item 6 was not canceled. Since Los Angeles was not granted a certificate of competency as to Item 9, the award to Slick Airways under Item 9 was not canceled.
*278 41. (a) On December 18, 1958, Mr. Hinger sent Coastal a telegram, stating:
IN ACCORDANCE WITH COMPTROLLER GENERAL’S DECISION NUMBEE B-137471 AND B-137482, DATED 9 DECEMBER 1958, AND LETTER EROM SMALL BUSINESS ADMINISTRATION DATED-15 DECEMBER 1958, THE AWARD TO YOUR COMPANY, COASTAL CARGO COMPANY, INC., OE ITEM NO. 7 OE IEB 11-6 2 6-5 9-3-CAB, IS HEREBY CANCELLED EEEECTIVE 18 DECEMBER 1958.
(b) On the same day, the contracting officer notified Los Angeles by telegram that it was awarded Item 7.
42. Coastal ceased performance under the prior award on. December 18, 1958. Los Angeles performed the remaining' portion of Item 7, for which it was paid $998,831.52.
43. On May 19, 1959, Coastal submitted a claim to GAO for $158,530.89 as a result of the cancellation of the award to that firm. The Comptroller General, by opinion No.. B-137471, dated July 8,1959, denied the claim on the ground that the award to Coastal was invalid from its inception in that the contracting officer had violated applicable law and regulations and had exceeded his authority in making the award.
On July 28, 1959, Coastal asked for a reconsideration of the opinion denying the claim, contending that its claim arose from a breach of a valid and enforceable contract or alternatively that, if the contract was invalid, Coastal was entitled to more than the contract price under the doctrine-of quantum meruit. The Comptroller General affirmed his-prior disallowance of the claim.
44. During the period October 1, 1958, to December 18,. 1958, Coastal performed 19 flights under the contract and received payment of $299,171.80 from the Government. The-total costs and expenses attributable to these military flights-were found upon audit to be $348,043.39, with a loss of $48-,871.59.[1]
*279 45. Included in the total costs and expenses attributable-to the military flights, as reflected in Finding 44 above, plaintiff claims there is included $81,652.85 of starting load and. termination costs as follows:
(1) Costs of $37,157.38 incurred by reason of Coastal flying the longer Gander, Newfoundland, route rather than via Bermuda on its westbound flights. These costs would have-been incurred even if Coastal’s contract had not been, canceled.
(2) Costs of $38,773.29, which were incurred as a result of an engine failure on October 6, 1958, on the return leg of Coastal’s first round, trip. This cost would have been incurred if the contract had not been canceled.
(3) Starting and termination costs of $15,880.01 for positioning aircraft and equipment, training, and positioning of personnel, and return of aircraft, equipment, and personnel: upon termination of the contract. An audit verified starting- and termination costs of $14,251.48. Had the contract not been canceled, Coastal would have amortized these costs of $14,251.48 over a total of 84 round trip flights, or an amortization charge of $169.66 per flight during the contract year.. Since there remained 65 flights at the time of contract termination, Coastal was unable to amortize $11,027.90 ($169.66-times 65) of the starting and termination costs.
46. Coastal incurred legal and accounting expenses in the-amount of $9,460 as a result of the cancellation of its contract by the Government. The legal expenses incurred amounted, to $6,960. Expenses in the amount of $4,790 were incurred, in the last quarter of 1958 in attempting to keep the Government from canceling Coastal’s contract. The remaining expense, amounting to $2,170, was incurred in the first quarter,of 1959 in connection with Coastal’s claim before the General Accounting Office. The accounting expenses amounted to-$2,500 and represented expenses incurred in the first quarter of 1959 for; the preparation of a financial report supporting-Coastal’s claim to the GAO.
47. Coastal claims that, as a result of defendant’s cancellation of its contract, it was deprived of anticipated profits-of $62,061.66, which it would have realized overall on the*, *280 military contract. Although not admitting liability, defendant asserts that if the contract had gone forward to completion, Coastal would have lost $11,946.34, and accordingly insists there is no established basis upon which Coastal can claim loss of profit.
The major difference between the parties relates to the methods adopted in projecting or estimating certain items of expense in order to determine the total estimated cost for completed performance of the remaining 65 flights under the original award.
48. Coastal also claims that, due to cancellation of the military contract on December 18, 1958, it was unable, because of a lack of sufficient lead time, to promptly schedule new business to replace the military flights. Air carriers usually require about 3 months to schedule regular business, since commercial, tourist, and business groups plan air trips at least 3 months in advance. Summer transatlantic business is often scheduled 6 months or more in advance. Coastal was precluded from scheduling or seeking this commercial business until after December 18, 1958, because it was performing the military contract until that date. If the computation is limited to the 3-month period following cancellation of its military contract (January 1-March 31, 1959), Coastal sustained an audited loss of $70, 727.54.
The record supports a finding that Coastal resumed normal operations after a period of 3 months immediately following the date of cancellation of Coastal’s contract.[2]
49. The contract entered into by Coastal and the Air Force contained a clause entitled “Termination for the Convenience of the Government” which stated, in part, as follows:
1. Except for cancellations pursuant to Part VII, Paragraph D, in the event the Government fails to provide the traffic guaranteed to the Contractor in accordance with schedules mutually agreed upon resulting in cancellation of a flight(s) without requesting Contractor to make up such cancelled flight (s) within the period *281 of performance set forth in the service order, or in event the Government terminates this contract other than for cause, reimbursement for termination costs shall be limited to_ costs based upon the following formula: Mean ACL times a negotiated rate. Such rate shall be based upon CAB accounts indicating costs incurred as a result of termination and such termination costs shall be set forth in a Supplemental Agreement hereto.
It should be noted that,- in lieu of the standard “Default” •clause, the contract contained a clause entitled “Termination for Cause.”
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c).
With regard to the defendant’s counterclaim, defendant is not entitled to recover, and the counterclaim is dismissed.

 The contracting officer was acting pursuant to Armed Services Procurement Regulations § 1-705.6 (revised June 11, 1958), as amended, 32 C.F.R. § 1.705-6 (1960), which provided, in part, as' follows:
“(b) If a small business concern has submitted an otherwise acceptable bid or proposal but has been found by the contracting officer to be nonre-sponsible as to capacity or credit, and if the bid or proposal is to be rejected for this reason alone, (i) SBA shall be notified of the circumstances so as to permit it to issue a certificate of competency, and (ii) award shall be withheld pending either SBA issuance of a certificiate of competency or the expiration of ten working days after SBA is so notified, whichever is earlier; subject to the following:
“(A) this procedure is mandatory except where the contracting officer certifies in writing that award must be made without delay and inserts in the contract file a statement signed by the contracting officer justifying the certificate(Emphasis supplied.)
Plaintiff suggests that, since bidding on item 7 was limited to “small business concerns,” ASPE § 1 — 705.6 may not have been applicable to that item. Plaintiff notes that the purpose of the referral procedure is to assure that “small businesses” receive their fair share of Government contracts. Plaintiff’s position is a reasonable one. However, in view of the decision which we reach, it is unnecessary for us to pass upon plaintiff’s assertion.

 Various claims of Los Angeles, arising out of its contract, are the subject of Trans International Airlines, Inc. v. United States, post, p. 312, 351 F. 2d 1001 (1965).

 As indicated above, the fact which triggered the actions of the GAO (and ultimately the cancellation of plaintiff’s award) was the failure of the contracting officer to prepare a certificate of urgency until after the award to plaintiff. This matter was not relied upon by defendant in its brief and oral argument. Furthermore, it is apparent that the time of execution of the certificate is not decisive. Here, the significant fact is that, before awarding the contract to plaintiff, the contracting officer had determined that the procurement must proceed without delay. Finding 12, infra.

 Regarding the matter of “urgency,” defendant cites Armed Services Procurement Regulations dealing with the circumstances under which contracts may be negotiated, rather than procured through advertising. One such circumstance is when the supplies are needed because of a fire or flood. ASPE §§ 3-202.1-.2, as amended, 32 C.F.R. §§ 3.202-1, 3.202-2 (1965). We do not accept defendant’s assertion that the cited regulations have relevance to the question at hand. The considerations pertinent to the dispensing with competitive bidding are not applicable here.

 The substance of the certificate- issued by 'the contracting officer is contained in finding 23, infra.

 In John Reiner & Co. v. United States, supra, p. 393, this court found It necessary to distinguish the following cases: Goldwasser v. United States, 163 Ct. Cl. 450, 325 F. 2d 722 (1963); Klein v. United States, 152 Ct. Cl. 8, 285 F. 2d 778 (1961). According to the majority opinion in Reiner, the decision in Klein and in Goldwasser should be limited (regarding this point) to holdings that “once the Government wrongfully terminates for default where there has been no default, it cannot thereafter seek to avoid liability by invoking a convenience termination.” (Emphasis supplied.) See Nesbitt v. United States, 170 Ct. Cl. 666, 669, 345 F. 2d 583 (1965), cert. denied, 383 U.S. (926); Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 355, 347 F. 2d 509 (1965).

 The termination-for-convenienee article involved in Reiner was the standard (pre-1962) clause. See finding 2 in Reiner, supra, p. 398. Coastal’s' contract contained not the standard clause, but a special one. Finding 49, infra. However, this distinction does not prevent the rationale of Reiner from being applicable here.

 The report of the trial commissioner contained a number of findings regarding possible awards to plaintiff, including one dealing with “termination for convenience * * *.” However, the latter finding was not based upon the particular termination-costs formula set forth in Coastal’s contract. See finding 49, infra. Por this reason, it will be necessary to determine, in Rule 47 (c) proceedings, the proper amount of termination costs.
It should be noted that, at the oral argument, defendant withdrew its exception to the “termination-for-convenience” finding. Thus, defendant admitted that, if the court were to apply this theory, plaintiff would be entitled to receive $47,536.04 (the amount arrived at by the trial commissioner).

 Plaintiff claimed total costs and expenses of $350,376.41 resulting in a loss-of $51,204.61 on the military flights. Defendant's audit deleted certain items-of expense as being incurred “out-of-period,” that is, not applicable to the-period of time when plaintiff had the military contract. While plaintiff objects-to these deletions, there is no support in the record to disprove defendant’s contentions.

 Coastal’s requested Finding 130 contains the following statement:
“Coastal did not obtain any regular business until tbe end of February 1959 and it did not resume normal operations until tbe end of tbe tbree-montb period following tbe contract cancellation.”