Sol O. SCHLESINGER, doing business as
Ideal Uniform Cap Company

v.

The UNITED STATES.

No. 155–56.

United States Court of Claims.

Feb. 16, 1968.

Harold F. Blasky, Washington, D. C., for plaintiff; Max E. Greenberg, New York City, attorney of record. Jerome Reiss, New York City, of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

DAVIS, Judge: *

█ The question here is how to treat the Government's termination of plaintiff's contract for default. The defendant and the Armed Services Board of Contract Appeals take the position that the default-termination was proper. Our trial commissioner and the plaintiff insist that it was a breach of the contract and should be dealt with as such. We hold that the termination should be considered as one for the convenience of the Government.

We place this conclusion on the facts found by the ASBCA (or proved conclusively by the record before it): On February 24, 1955, plaintiff submitted his bid to the Navy for furnishing 50,000 blue service caps for enlisted men in response to an invitation for bids requiring delivery by July 31, 1955, on a schedule to be supplied by the bidder. Plaintiff was equipped to perform this work, having completed a contract for 240,000 identical caps for the Navy in 1954. At bid opening on February 25, he was the second lowest bidder. His bid required acceptance within 20 days, or by March 17, and offered delivery of 15,000 caps in each of the months of April, May, and June, and 2,696 caps in July for a destination in Pennsylvania, plus 2,304 caps in June for a destination in Utah.

Plaintiff needed the work and had expected acceptance of his bid by early March. On March 16 the contracting officer requested an extension of time beyond March 17 for acceptance, and the plaintiff consented to seven days, an intentionally brief period in order not to jeopardize his arrangements with suppliers. Thereafter, four additional requests by the Navy, granted by plaintiff, extended the period for acceptance of the bid to April 23, 1955. These extensions were necessitated by the fact that the low bidder was not declared to be non-responsible until April 4, 1955.

On April 14, 1955, a Government employee notified plaintiff by telephone that he had been awarded the contract to be dated April 14, gave him the contract number, and instructed him to provide the required performance bond. Plaintiff procured the bond on April 15 (received by defendant April 19), and proceeded to take the risk of ordering some of the 13 component materials which the contract required him to furnish. Technically the Government would not be bound until the written award was made (Ship Constr. & Trading Co. v. United States, 91 Ct.Cl. 419, 456 (1940), cert. denied, 312 U.S. 699, 61 S.Ct. 737, 85 L.Ed. 1133 (1941)), and that is why we say plaintiff took a risk in obligating himself to suppliers before having a contract enforceable against the Government. Except for thread, which was ordered on April 28, the record does not reflect the plaintiff's purchase orders for the components, but it is probable that they were ordered both before and after May 3, the date plaintiff received the formal contract award back-dated to April 14.

Upon receiving the written award on May 3 the plaintiff learned for the first time that the delivery schedule which he had specified in his original bid had been unilaterally revised by the Government by postponing the deliveries for each month to Pennsylvania by one month, and the small delivery to Utah by two

* The court is indebted to Trial Commissioner C. Murray Bernhardt from whose opinion we have borrowed in part, although we direct a somewhat different disposition. The relevant facts are set forth in our opinion.

months. This general one-month postponement of the original delivery schedule was designed to offset the Government's 28-day delay in issuing the award (from March 17 to April 14), but the plaintiff was not consulted. He now says that he considered it doubtful that he could perform under the revised schedule but he made no mention of this until June 28, because, he contends, he felt at the time, on the basis of his experience in previous contracts, that he could secure reasonable adjustments from the contracting officer if need be.

The cutting operations for the caps were commenced toward the end of May. Plaintiff received the first two shipments of half of the Government-furnished cloth on April 29 and May 5, and the remaining half by May 26. In the garment trade it is desirable to have all of the cloth for cutting on hand at an early date, since the mass cutting of component parts is the first major step in production. We do not have the plaintiff's cutting schedule for he did not furnish weekly cutting reports as the contract required, perhaps because the Government failed to furnish him the forms (as the contract required) and he did not ask for them.

The contract also required plaintiff to submit to the Government for approval, prior to commencement of production, pre-production samples of 12 component materials which the contractor was to provide, plus two samples of the completed cap. From May 27 to June 17 the plaintiff submitted his 12 pre-production material samples to the contracting officer as fast as he obtained them from suppliers, and they were promptly inspected and approved by the Government well within the 10-day maximum period allowed by the contract. Plaintiff never submitted samples of completed caps because his contract was terminated for default before he delivered any of the items, and he had intended to obtain his sample caps from the earliest production run to satisfy the contract requirement. This may not have been strictly

in accordance with the contract, but the plaintiff says that he reasoned that he had already demonstrated his ability to produce the identical cap in a completed contract for 240,000 of them the previous year, and felt that samples of actual production would be preferable to handmade specimens.

In any event, plaintiff failed to make the first delivery of 15,000 caps indicated by the revised delivery schedule to be due May 31. On June 14, 1955, the contracting officer advised him in writing that deliveries were delinquent, and observed that "satisfactory pre-production samples and components have not yet been approved although the contract award date was 14 April 1955". Actually by June 14 the plaintiff had submitted to the contracting officer for approval pre-production samples of all materials except the thread, which was not submitted until June 17 because plaintiff did not receive it from his supplier until June 9 and 14; nor had he submitted the two pre-production sample caps. The contracting officer's letter of June 14 concluded with this paragraph:

This letter notice is your first warning concerning delinquency in deliveries of Caps, service, under the subject contract. You are requested to immediately advise the Contracting Officer the specific dates on which deliveries can be expected. Upon receipt of the information further determination will be made regarding the status of your contract.

■■ The Board properly held that this letter did not constitute an effective notice under Article 11(a) (ii) of the contract, relating to termination for such failure to make progress as to endanger performance of the contract. This provision required a 10-day notice of the condition, as well as a failure by the contractor to cure it, before a termination for default on that ground could be had. The Board also found, and we accept its determination, that, by this letter of June 14 and its failure to end performance at that time, the de-

fendant waived plaintiff's default in not shipping 15,000 caps by May 31st.[1]

Plaintiff did not respond until June 28 to the contracting officer's warning notice of June 14. In the interim Mr. Schlesinger was to testify before the Permanent Subcommittee on Investigations of the Senate Committee on Government Operations on June 21 in executive session and June 23 in public session. The Senate Subcommittee was investigating textile procurement in the military services, and plaintiff was a prime suspect in connection with certain alleged irregularities. Plaintiff says that he was busy preparing numerous records which Subcommittee investigators had demanded he produce. He testified that, en route to Washington on June 23 to attend public hearings that day as a witness, he ran into the contracting officer on the airplane, and told him that he had been busy in connection with the activities of the Subcommittee but that he would reply to the contracting officer's June 14th letter within the next few days. To which the contracting officer is said to have responded (although he could not recall it in testifying before the Board, agreeing only that they had met on the plane and had had some conversation) that "that was perfectly all right". The Board did not decide whether or not this exchange actually took place and, in view of the contracting officer's testimony, the evidence cannot be said to be conclusive in plaintiff's favor.

There is no doubt that Mr. Schlesinger did appear before the Subcommittee late in June, and the Board found that on June 27 a naval officer in Washington told the contracting officer that the Chairman of the Subcommittee had sent a letter to the Navy Department "asking as to the status of the contract and implying that the contract should be cancelled". This naval officer was the Assistant to the Assistant Chief of the Navy's Bureau of Supplies and Accounts for Purchasing, and he inquired from the contracting officer as to the status of plaintiff's contract and told him that, if investigation established that there was no urgent need for the caps, it was intended that the contracting officer should terminate for default. After the contracting officer had ascertained that there was no urgent need for the caps and that all pre-production components (but no completed caps) had been approved, and had communicated this information to the Assistant in Washington, the latter advised him to consider all the facts and to check with legal counsel to find out whether the contract could legally be terminated for default at that time.

A representative of the Inspector of Naval Material in New York then made a brief inspection of plaintiff's plant on June 29, and orally reported to the contracting officer that as of that time there were about 19,000 caps in various stages of manufacture, and about 3,000 to 4,000 caps completed and ready for blocking.[2] Another shipment of 15,000 caps was due on June 30th but was not made. On that day (but before it had ended) the contracting officer advised the Bureau of Supplies and Accounts in Washington that he intended to terminate the contract for default. At 12:43 p. m., on the same day, he received a telegram from the Bureau instructing him as follows:

Terminate contract * * * immediately for default. Advise when this

1. The Board found, too, that the non-delivery by May 31st was beyond plaintiff's control and without his fault or negligence.

2. An experienced (since 1913) manufacturer of visors and trimmings for the hat and cap trade, who had served as consultant to the Government and to hat manufacturers, testified for plaintiff before the Board that, as of the suspension of plaintiff's performance of the contract in suit, there were 8,000 caps practically complete except for blocking, and that another 15,000 partly finished caps could have been finished in about 10 days. The Board made no finding on the point.

action completed. Keep BUSANDA [the Bureau] informed of subsequent developments.

Meanwhile, on June 28, the plaintiff finally replied to the contracting officer's warning letter of June 14. This reply said that completed end-items would be coming through production within a few days, and requested a 45-day time extension on the delivery dates by reason of conditions which had arisen. These conditions included, in plaintiff's view, the Government's initial delays in accepting plaintiff's bid, and the fact that an insufficient adjustment in time was allowed when the revised delivery dates were written into the formal contract by the Government. The letter explained that plaintiff had not made the request for a time extension sooner because he was attempting to meet the revised delivery date and found that conditions rendered it impossible. This letter of June 28 was not received by the contracting officer until 2 p. m., on June 30, after the telegram from the Bureau in Washington directing the termination of the contract for default.

On July 1 the contracting officer telegraphed plaintiff:

* * * Your contract * * * for caps * * * is hereby terminated in its entirety pursuant to clause en-

titled default of the contract effective immediately. Letter and instructions for disposition of all Government furnished property will follow.

Although this telegram probably arrived at plaintiff's office on Saturday, July 2, he first saw it on Tuesday, July 5, upon returning to his office from the July 4th weekend.

On July 5 plaintiff and his attorney called upon the contracting officer in New York City. On July 6 the contracting officer confirmed the contract termination with a letter.[3] With this the plaintiff ceased production as directed, appealed the default-termination without avail to the Secretary of the Navy, applied to the Board of Contract Appeals, had a hearing there, and an adverse decision on October 31, 1955, plus a further Board decision on December 20, 1955, denying his motion for reconsideration. Suit was filed here on April 9, 1956. The long delay in this court is unfortunate but does not appear attributable in any substantial part to the court, and with respect to the parties there were extenuating circumstances.

■ As the Board found, plaintiff was at least in technical default when his contract was terminated on July 1st. He was required to deliver 15,000 caps by June 30th and did not do so.[4] The

---

3. The pertinent parts of this letter are:
"This will confirm our telegram of 1 July 1955, which read as follows:
"'YOUR CONTRACT NO. N140–62236s –54294B FOR CAPS CMM BLUE CMM ENLISTED MEN'S IS HEREBY TERMINATED IN ITS ENTIRETY PURSUANT TO CLAUSE ENTITLED DEFAULT OF THE CONTRACT EFFECTIVE IMMEDIATELY X LETTER AND INSTRUCTIONS FOR DISPOSITION OF ALL GOVERNMENT FURNISHED PROPERTY WILL FOLLOW'
"The above default action has been taken based upon your inability to meet an acceptable delivery schedule and to perform the contract in accordance with its terms, as indicated in part by your letter of 28 June 1955. Nothing contained in your letter of 28 June 1955 is considered to constitute an excuse for your failure in performance.

* * * * *

"You are further advised that, in addition to its other rights and remedies, and as provided in the aforementioned clause entitled 'DEFAULT', the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those herein terminated, and you shall be liable to the Government for any excess costs for such similar supplies or services.
"The telegram of 1 July 1955, as confirmed by this letter, constitutes a decision of the Contracting Officer made pursuant to the clause of the contract entitled 'Disputes'."

4. Before the Board plaintiff argued, among other things, that (1) the defendant had actually waived the June 30th delivery date, (2) the contractor never agreed to the revised delivery schedule,

default-termination article authorized the Government to terminate "if the Contractor fails to make delivery of the supplies \* \* \* within the time specified herein or any extension thereof." [5] Other parts of the clause (subparagraphs (b) and (e)) make clear that such a failure to deliver is a default even though excusable or justifiable because "due to causes beyond the control and without the fault or negligence of the Contractor." The Board was therefore correct in upholding the bare existence of the default.

■ Our difficulty is that the default article does not *require* the Government to terminate on finding a bare default but merely gives the procuring agency discretion to do so, and that discretion was not exercised here by the Navy. The existence of discretion is undeniable. The clause says that "the Government *may* \* \* \* terminate" (emphasis added), not "shall" or "must". We have recognized that a decision to terminate for convenience is rooted in discretion (Commercial Cable Co. v. United States, 170 Ct.Cl. 813, 821 (1965); John Reiner & Co. v. United States, 325 F.2d 438, 442–443, 163 Ct.Cl. 381, 390 (1963), cert denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964)), and though the factors the Government will wish to consider may be different when a default is involved there is no reason to read the default article, contrary to its literal

---

including the June 30th date, and (3) the contract really provided for reasonable delivery times, not the specific dates unilaterally inserted by defendant. These contentions (all rejected by the Board) were repeated, in effect, in plaintiff's assignment of errors in this court, but they were not discussed by the trial commissioner and were not repeated or argued in plaintiff's written or oral presentation to the court after the commissioner's opinion. In the circumstances we consider that plaintiff has abandoned these points, choosing to rest his case on the separate grounds suggested by the commissioner.

5. The relevant portions of the article are as follows:

"11. DEFAULT

"(a) The Government may, subject to the provisions of paragraph (b) below, by written Notice of Default to the Contractor terminate the whole or any part of this contract in any one of the following circumstances:

"(i) if the Contractor fails to make delivery of the supplies or to perform the services within the time specified herein or any extension thereof; or

\*　\*　\*　\*　\*

"(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negligence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule.

"(c) In the event the Government terminates this contract in whole or in part as provided in paragraph (a) of this clause, the Government may procure, upon such terms and in such manner as the Contracting Officer may deem appropriate, supplies or services similar to those so terminated, and the Contractor shall be liable to the Government for any excess costs for such similar supplies or services, *Provided*, That the contractor shall continue the performance of this contract to the extent not terminated under the provisions of this clause.

\*　\*　\*　\*　\*

"(e) If, after notice of termination of this contract under the provisions of paragraph (a) of this clause, it is determined that the failure to perform this contract is due to causes beyond the control and without the fault or negligence of the Contractor pursuant to the provisions of paragraph (b) of this clause, such Notice of Default shall be deemed to have been issued pursuant to the clause of this contract entitled 'Termination for Convenience of the Government,' and the rights and obligations of the parties hereto shall in such event be governed by such clause. \* \* \*

"(f) The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract."

terms and the accepted practice, as compelling termination. We are certain that there have been a great many instances in which the Government has not terminated a contractor in technical default, but has granted an extension or waived the non compliance. In this very case the defendant, as the Board found, excused the earlier non-delivery on May 31st which was, of course, also a default. Our ruling today is not new. More than ten years ago, the court specified that procurement officials had to exercise judgment in terminating an agreement for default and were not automatons. John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 704–705, 132 Ct.Cl. 645, 658–660 (1955).

We hold, too, that this discretion was never exercised but the Navy simply surrendered its power of choice. This is so clear from the Board's record that we are warranted in reaching the conclusion despite the Board's failure to consider the point.[6] Although the Congressional communication does not appear to have suggested that the plaintiff's contract be canceled without consideration of his rights or situation, or even that it be terminated for default rather than for convenience (which would give the contractor his reasonable expenses to

date), the Navy acted as if it had no option but to terminate for default (barring all compensation) once the mere fact of non-delivery was found. The Navy did not consider whether an extension should be granted or the June 30th default waived (as that of May 31st had been) so as to allow delivery in July.[7] The guillotine was dropped immediately after the non-delivery of June 30th, and was strongly contemplated even before that day had been reached or passed.

The Bureau of Supplies and Accounts, on June 27th, called the contracting officer and put in motion the process of terminating the contract for default. So far as the record reveals, the Navy's only expressed concern involved the existence of a default and the need for the supplies. There was no indication of any concern for the contractor or whether a default would be excusable, no consideration of a possible waiver or an extension, no weighing of a convenience-termination instead of a default-termination. After it was discovered, also on June 27, that there was no present requirement for the caps, the only interest of the Bureau was "whether we can legally terminate the contract for default at this time." (We emphasize again that this was even before the de-

---

**6.** The issue was, however, sufficiently though skimpily raised before the Board by the contractor's argument in its administrative brief that the contracting officer "operated under the influence not of reason but a desire to please his superior officers" and "the contracting officer in declaring the contract in default did not act in a reasonable manner, but under the influence of the desires of his superior officers to terminate." The brief also referred to the Navy's reaction to the Congressional communication. Though the plaintiff's arguments were phrased in terms of an abdication of function by the contracting officer and we do not limit our inquiry to that official (see infra), we think that it is fair to find, in the circumstances, that the plaintiff did present to the Board the question of the Navy's total abdication of its discretionary role.

**7.** There is no need to decide whether an extension after June 30th would actually

have been granted if the Navy had not needlessly abjured its discretionary function upon receiving the Congressional letter. The record contains enough evidence to show that doubtless an extension would at least have been considered, i.e., that discretion would have been invoked. The May 31st delivery date had been waived, and the contracting officer's June 14th letter seemed to invite consideration of new delivery dates. Also, as of June 30th, the contracting officer knew that plaintiff had about completed from 3,000 to 4,000 caps and that another 19,000 caps were in various stages of manufacture. The Navy must have known, too, that there was a good chance that plaintiff could deliver his first installment of 15,000 caps in the early or middle part of July. Mr. Schlesinger's letter of June 28th (received June 30th) seemed to ask for an extension to July 15th.

livery date of June 30th, and not long after the Navy had indicated a less harsh position in waiving the non-delivery of May 31st.) Speed was demanded and quick action taken. The contracting officer was to call the Bureau on June 28th, the next day, "outlining our determination on the facts pro and con regarding termination." [8] The actual decision to terminate was then made on the morning of June 30th (though the telegram was not sent until July 1st) and was apparently not reconsidered after the receipt, in the afternoon of June 30th, of the contractor's letter (of June 28th) requesting a reasonable extension. As for the contracting officer himself, he admitted that he exercised no discretion at all; his testimony was that he was directed to terminate for default and also that he "did not feel that [he] had any choice after the receipt of the direction from a superior in this case."

We do not put our decision on the failure of the contracting officer to exercise his own judgment. This agreement gave the default-termination power to "the Government" and did not single out the contracting officer as the official to decide that particular question.[9] But the record affirmatively shows that nobody in the Navy, neither the contracting officer nor his superiors, exercised the discretion they possessed under the article. Plaintiff's status of technical default served only as a useful pretext for the taking of action felt to be necessary on other grounds unrelated to the plaintiff's performance or the propriety of an extension of time. As in *John A. Johnson Contracting Corp.*, supra, the Navy used the termination article as a "device" and never made a "judgment as to the merits of the case". 132 F.Supp. at 705, 132 Ct.Cl. at 659–660. Such abdication of responsibility we have always refused to sanction where there is administrative discretion under a contract. New York Shipbuilding Corp. v. United States, 385 F.2d 427, 435, 436–437, 180 Ct.Cl. 446, 460 (June 1967), and cases cited. This protective rule should have special application for a default-termination which has the drastic consequence of leaving the contractor without any further compensation. See Acme Process Equip. Co. v. United States, 347 F.2d 509, 527–528, 171 Ct.Cl. 324, 355 (1965), rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966).

Since the July 1st notice was thus issued improperly it cannot have the same status as a default-termination which is the fruit of true consideration. Cf. New York Shipbuilding Corp. v. United States, supra. There are two theories as to the consequences, but both lead to the same result. The first, and preferable one, is that the termination notice was a nullity and therefore there was no valid ending of performance on the ground of default. Under this view —that the contract was canceled on an unsound ground and in an illegal manner

---

**8.** The details appear in a memorandum for the file prepared by the contracting officer on June 27th recording the substance of his conversations on that day with the Assistant to the Assistant Chief of the Bureau of Supplies and Accounts for Purchasing, as well as summarizing the contracting officer's own actions with respect to the contract on that day. This memorandum is included in the Board record.

**9.** On this precise and limited point, John A. Johnson Contracting Corp. v. United States, 132 F.Supp. 698, 704–705, 132 Ct.Cl. 645, 658–660 (1955), is distinguishable. With respect to the termination in that case, the contracting officer did not follow the directive of any superior (as he did on another aspect of the case) ; he issued his notice of default termination solely as "a device to satisfy what lawyers told him were, or probably were, the legal requirements of the situation." Id. 132 F.Supp. at 705, 132 Ct.Cl. at 660. So far as appears, no other procurement official but the contracting officer was involved, and the court did not hold, and had no occasion to hold, that a superior cannot call for a default-termination.

On the broader issue of abdication of responsibility, the *Johnson* case is, of course, squarely in point, as we say immediately below in the text.

—the termination must be treated, not as a breach of contract, but as a termination for convenience since the contract contained a "convenience" clause which could have been used to end performance if the Navy thought it well to do so on learning of the Senate committee's views. This is the teaching of John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), and like cases.[10] It is only where a contractor is defaulted when he is *not* at all in default that a breach can be said to occur. Klein v. United States, 285 F.2d 778, 152 Ct.Cl. 8 (1961); Acme Process Equip. Co. v. United States, supra, 347 F.2d at 527–528, 530 n. 29, 171 Ct.Cl. at 355, 360 n. 29, and cases cited; Coastal Cargo Co. v. United States, 351 F.2d 1004, 1007 n. 6, 173 Ct.Cl. 259, 264 n. 6 (1965).[11] Here, as we have pointed out several times, there was in fact a default.

The alternative theory is that the default should be treated, under paragraph (e) of the article (note 5 supra), as a "failure to perform this contract" which is "due to causes beyond the control and without the fault or negligence of the Contractor." It can be argued (1) that since the plaintiff actually failed to deliver, the termination notice, though improper, was valid enough to trigger the operation of the article; but (2) that the contractor's failure to perform on June 30th and to be allowed to perform thereafter was so tied to the Navy's refusal to exercise its discretion (as to waiving the default and granting a time-extension); that (3) this failure of the Navy was, as a matter of law under paragraph (e), a cause beyond the contractor's control and without his fault or negligence. In such a case paragraph (e) directs that the termination be treated as one for convenience.

On either ground the plaintiff is entitled to have his accounts settled as if his contract had been formally terminated for the Government's convenience. Since a convenience-termination arises under the contract, the determination of the award must be made, if the parties cannot agree, by the ASBCA in further proceedings before it.

Plaintiff is entitled to recover and judgment is entered for him on the issue of liability. Further action in this court will be suspended for six months from this date to allow the parties to return to the Armed Services Board of Contract Appeals for a determination of the amount, if any, to which plaintiff would have been entitled if his contract had been terminated pursuant to the convenience-termination article. Upon the conclusion of the Board proceedings, the plaintiff will report the result to the court and the parties will take further action looking toward the ultimate disposition of the case in this court.

---

10. See Brown & Son Elec. Co. v. United States, 325 F.2d 446, 163 Ct.Cl. 465 (1963); Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 96 n. 9, 167 Ct.Cl. 604, 609 n. 9 (1964); Nesbitt v. United States, 345 F.2d 583, 170 Ct.Cl. 666 (1965), cert. denied, 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966); Coastal Cargo Co. v. United States, 351 F.2d 1004, 1007–1008, 173 Ct.Cl. 259, 263–264 (1965); Warren Bros. Roads Co. v. United States, 355 F.2d 612, 616, 173 Ct.Cl. 714, 722–723 (1965).

11. Even in that instance recent default articles equate an erroneous default termination with a convenience termination. See Dale Constr. Co. v. United States, 168 Ct.Cl. 692, 722 n. 22 (1964). The cited decisions refer to the older form.