**NUCLEAR RESEARCH
CORPORATION,
Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 86–1434.**

United States Court of Appeals,
Federal Circuit.

March 19, 1987.

Gary G. Stevens, Saltman & Stevens, P.C., Washington, D.C., argued for appellant. With him on brief was Ruth G. Tiger.

Karen Fishman, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With her on brief were Richard K. Willard, Asst. Atty. Gen.,

David M. Cohen, Director and Mary Mitchelson, Asst. Director. Martha A. Klein, Dept. of Navy, of counsel.

Before SMITH, Circuit Judge, BALDWIN, Senior Circuit Judge, and BISSELL, Circuit Judge.

EDWARD S. SMITH, Circuit Judge.

This is an appeal from the Armed Services Board of Contract Appeals' (board) final decisions in ASBCA No. 28641 and in ASBCA No. 28979.[1] The board affirmed the contracting officer's (CO) final decisions terminating the contract for default (ASBCA No. 28641) and demanding return of unliquidated progress payments (ASBCA No. 28979). The board's final decisions are affirmed.

## ISSUES

The issues presented on appeal are:

1. Whether the board had jurisdiction over the appeals from the CO's final decisions;

2. Whether the board erred in finding that the CO had exercised discretion in deciding to terminate the contract for default; and

3. Whether the board erred in sustaining the CO's decision to terminate the contract for default.

## BACKGROUND

On September 21, 1981, the Navy awarded Nuclear Research Corporation (NRC) a fixed-price contract for 24,930 thermoluminescent dosimeters (TLD). The TLD's are radiation monitoring devices designed to be worn by Naval personnel in areas where they might be subject to greater than normal radiation.

A TLD is a small cylinder containing two small chips of manganese activated calcium fluoride to measure radiation exposure. The Navy required the TLD's to be reusable, by "baking out" the stored radiation, at least 600 times.

---

1. *Nuclear Research Corp. v. United States,* ASBCA Nos. 28641 and 28979, 86–2 BCA (CCH) ¶ 18,953.

Under the original contract, NRC was to begin delivering TLD's in 120 days, or by January 25, 1982, at the rate of 2,500 TLD's per month until complete. NRC was unable to deliver acceptable TLD's because of difficulty in obtaining satisfactory calcium fluoride chips. The contract was modified twice to allow deliveries to begin on February 23, 1983, at the rate of 2,000 TLD's per month.

On or about February 23, 1983, NRC delivered the first lot of 2,000 TLD's, but the lot was rejected for failure to pass the testing set out in the contract. On March 14, 1983, the Navy formally warned NRC that default termination was being considered. On April 22, 1983, NRC shipped a "partial lot" of 400 TLD's, but the Navy refused to test the shipment, stating that it was too small to test economically.

On May 4, 1983, the CO issued a final decision terminating the contract for default for failure to deliver acceptable supplies within the time specified in the contract. On August 3, 1983, the CO issued another final decision demanding return of $332,752 in unliquidated progress payments.

NRC appealed both decisions to the board. After hearings, the board affirmed both decisions in a single opinion with detailed findings of fact and conclusions of law.

## ANALYSIS

### A. *Jurisdiction of the Board.*

The Government urges that the board had no jurisdiction over the appeal from the CO's decision on default termination because the decision did not involve a claim for money. The Government further argues that the decision on return of unliquidated progress payments was completely independent of, and separately reviewable from, the decision on default termination.

In this instance, the board properly exercised jurisdiction over the combined appeals from both decisions. The decision on return of unliquidated progress payments involved the *Government's* claim for money. The net amount of money owed by NRC is dependent on the propriety of the CO's decision to terminate the contract for default. If default termination were improper, NRC may have been entitled to a settlement whereby its costs would have been subtracted from the payments received.

We hold that, in this case, the board had jurisdiction over the appeal from the final decision on default termination as well as the appeal from the final decision on the amount of unliquidated progress payments to be returned.[2]

### B. *Contracting Officer's Discretion to Terminate for Default.*

In deciding whether to terminate a contract for default, the CO is required to exercise his discretion, to make sure that termination is in the best interests of the Government.[3] Here, NRC argues that the CO was simply following instructions to terminate the contract by the using agency, Naval Electronics Systems Command (NAVELEX), and that he failed to exercise any discretion.

However, it is not the function of this court to make factual findings. The board heard the testimony, observed the witnesses, and considered all the evidence, and the board found that the CO had exercised his own discretion in deciding to terminate the contract. We must affirm the board's decision unless it is legally in error, fraudulent, arbitrary, capricious, so grossly erroneous as to necessarily imply bad faith, or unsupported by substantial evidence.[4] It is under this standard that we must review the record before us.

NRC's argument relies on evidence that, on April 28, 1983, the CO prepared an

**2.** See Dewey Elecs. Corp. v. United States, 803 F.2d 650 (Fed.Cir.1986).

**3.** Darwin Constr. Co. v. United States, 811 F.2d 593 (Fed.Cir.1987); Fairfield Scientific Corp. v. United States, 611 F.2d 854, 862, 222 Ct.Cl. 167 (1979).

**4.** 41 U.S.C. § 609(b) (1982).

internal memorandum concluding that, although the Government had the legal authority to terminate for default, it was not in the best interests of the Government to do so. NAVELEX, however, did not agree with the CO's initial recommendation to continue the contract. After consulting with NAVELEX, the CO issued a final decision terminating the contract for default on May 4, 1983.

■ However, there is no implied prohibition against the CO consulting with the agency which would actually use the TLD's.[5] Indeed, it is difficult to imagine how the CO could make an informed decision about the best interests of the Government without consulting with the agency most affected by the contract. The fact that the CO changed his mind after discussing the contract with NAVELEX, without more, is insufficient to show an abdication of discretion.[6]

Moreover, there is substantial evidence to support the board's decision. The CO testified that, although he considered the desires of the using agency, the final decision to terminate was his own. He further testified that his decision was based on his view that termination for default was in the best interests of the Government.

NRC had the opportunity to cross-examine the CO on the independence of his decision,[7] but NRC failed to show that the CO had been directed to terminate for default[8] or otherwise improperly influenced in his decision.[9]

Therefore, the board's finding, that the CO exercised discretion in deciding to terminate the contract for default, is affirmed.

C. *Reasons for Default Termination.*

■ First, NRC argues that the Navy failed to prove to the board that NRC did not furnish conforming goods in a timely manner, because the Navy's test procedures were unreliable and contractually unauthorized. The burden of proving that a default occurred is on the Government, which established a prima facie case of default by submitting test results showing that the TLD's were defective.[10] The board found that NRC failed to overcome the Government's prima facie case, and it is NRC's burden on appeal to show that the board's finding is unsupported by substantial evidence.

NRC alleges that the Navy's test results were unreliable because of inadequate supervision, insufficient recordkeeping, and mishandling of samples. The board specifically rejected these arguments after examining the test procedures in considerable detail. The board also rejected NRC's argument that the Navy's test procedures were more stringent than authorized by the contract. The board's finding that the Navy's test results were reliable and authorized is supported by substantial evidence.

■ Second, NRC argues that it was excused from its failure to deliver TLD's on time because it did not receive a sufficient quantity of usable calcium fluoride chips in time to manufacture the TLD's. The board found that the Navy had made sufficient allowance for NRC's supply problems by extending the time to commence delivery over 1 year beyond the 120 days provided in the original contract. The board also found that NRC had a sufficient quantity of the chip material from at least February 1, 1983, through May 6, 1983, to meet the modified delivery schedule. The board stated that NRC's inability to deliver prior to the termination action was due to NRC's inability to adequately design the TLD's. On appeal, NRC has failed to show that the board's finding that NRC was not excused from performance is unsupported by substantial evidence.

---

5. *Pacific Architects and Eng'rs, Inc. v. United States,* 491 F.2d 734, 744, 203 Ct.Cl. 499.

6. *Id.* at 745–46.

7. *Cf. Fairfield Scientific Corp.,* 611 F.2d at 862 (case remanded because board improperly limited right to cross-examine contracting officer).

8. *See Schlesinger v. United States,* 390 F.2d 702, 709, 182 Ct.Cl. 571 (1968).

9. *See Fairfield Scientific,* 611 F.2d at 861 (no evidence of inducement by competitor).

10. *Astro Science Corp. v. United States,* 471 F.2d 624, 627, 200 Ct.Cl. 354 (1973).

Finally, NRC argues that it was not provided with the opportunity to rework or screen and resubmit the TLD's as allowed by the contract. The board rejected this argument, finding that the defects in the TLD's were not of such nature as to permit reworking or screening, that NRC was given a reasonable amount of time in which to attempt any reworking or screening, and that NRC simply scrapped the returned TLD's without attempting to salvage them. The board's finding is supported by substantial evidence.

### CONCLUSION

For the reasons stated above, the board's final decision sustaining the CO's termination of the contract for default is affirmed. Because the default termination was proper, NRC must return the unliquidated progress payments it' received from the Government. The amount of unliquidated progress payments was stipulated by the parties. Therefore, the board's final decision sustaining the CO's decision on return of unliquidated progress payments is also affirmed.

AFFIRMED.