NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**SERVANT HEALTH, LLC, TRANSCENDENCE, INC., NOBLE ATTORNEY, LLC,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-2193

---

Appeals from the United States Court of Federal Claims in Nos. 1:21-cv-01373-AOB, 1:21-cv-01456-AOB, 1:21-cv-01472-AOB, Judge Armando O. Bonilla.

-------------------------------------------------

**AMERICAN MEDICAL EQUIPMENT, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-2194

---

Appeal from the United States Court of Federal Claims in No. 1:21-cv-01553-AOB, Judge Armando O. Bonilla.

---

Decided: September 30, 2024

---

CAROL ANNE THOMPSON, Federal Practice Group, Washington, DC, argued for plaintiffs-appellants.

KELLY GEDDES, Commercial Litigation Branch, Civil Division, United States Department of Justice, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY.

---

Before REYNA, MAYER, and CUNNINGHAM, *Circuit Judges.*

CUNNINGHAM, *Circuit Judge.*

At issue in this appeal are four supply contracts awarded to American Medical Equipment, Inc. ("AME"), Servant Health, LLC ("Servant"), Noble Attorney, LLC ("Noble"), and Transcendence, Inc. ("Transcendence") (collectively, the "Plaintiffs" or "Appellants") by the U.S. Department of Veterans Affairs ("VA") for nitrile examination gloves during the COVID-19 global pandemic. The VA terminated all the contracts for cause or default. The Plaintiffs challenged the VA's terminations for default before the Court of Federal Claims, culminating in two actions. *See Am. Med. Equip., Inc. v. United States*, 160 Fed. Cl. 344, 347 (2022) ("*Decision I*"); *Servant Health, LLC v. United States*, 161 Fed. Cl. 210, 214 (2022) ("*Decision II*"). For the reasons below, we *affirm*.

## I.   BACKGROUND

### A.

In late 2020, due to the COVID-19 global pandemic, the VA concluded that it needed to procure "hundreds of millions of nitrile examination gloves" to "maintain a 180-day stock of nitrile examination gloves to ensure the availability of gloves for the Agency's healthcare providers." *Decision I* at 347; *Decision II* at 214; J.A. 2605. This appeal relates to two solicitations for the procurement of nitrile examination gloves, Nos. 36C24921Q0088 and 36C24921Q0115. *Decision I* at 348; *Decision II* at 214; *see also* J.A. 150–208; J.A. 1556–618.

Both solicitations indicate that they are "request[s] for quantity on hand to be delivered within 45 calendar days from order." *Decision I* at 348; *Decision II* at 215; J.A. 155; J.A. 1561. Both solicitations state that "[c]ontracts that are awarded based on submitted quotes will have 45 calendar days from receipt of order (award date) to deliver the awarded quantities, or the contract will be terminated for cause." J.A. 155; J.A. 1561. The solicitations also include multiple other provisions emphasizing that delivery must be made within 45 calendar days. *See, e.g.*, J.A. 157 ("Delivery is required within 45 calendar days after receipt of order[.]"); J.A. 1563 (same); J.A. 158 ("B.4 Delivery Schedule[:] 45 calendar days after receipt of order."); J.A. 1564 (same); J.A. 190 ("Delivery Schedule: To be eligible for award, Offerors must be able to deliver within 45 calendar days from the award date."); J.A. 1595 (same).

Both solicitations also incorporate pertinent provisions of the Federal Acquisition Regulation ("FAR")[1] governing

---

[1]    The FAR is codified in Title 48 of the Code of Federal Regulations. For ease of reference, we refer to the FAR without the corresponding C.F.R. citations.

commercial item acquisition, including FAR 52.212-4(f), which provides in relevant part:

> Excusable delays. The Contractor shall be liable for default unless nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers.

*Decision I* at 348; *Decision II* at 215–16; J.A. 159; J.A. 1565.

The solicitations also incorporate FAR 52.212-4(m), which provides in relevant part:

> Termination for cause. The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance.

*Decision I* at 348; *Decision II* at 216; J.A. 163; J.A. 1569.

The gloves are required to meet certain mandatory technical requirements under the solicitations, including that the gloves shall be "Brand Name or Equal To: Bosma Enterprises, Nitrile Textured Exam Glove." J.A. 155; J.A. 1561. The solicitations further specify that the offeror must provide evidence demonstrating that each proposed product meets or exceeds the mandatory technical requirements. *Decision II* at 215; J.A. 155–56; J.A. 1561–62. Failure to provide this evidence renders the quote ineligible for contract award. *Decision II* at 216; J.A. 155–56, 183; J.A. 1561–62, 1588. The solicitations also include a

questionnaire and spreadsheet, instructing offerors to provide details—such as Original Equipment Manufacturer ("OEM") name ("glove name - make and line") and "OEM number (part number)"—for each quoted glove.  J.A. 156; J.A. 1562.

## B.

On February 16, 2021, AME submitted an offer to supply 10 million gloves. *Decision I* at 348–49; J.A. 2006, 2012. On April 16, the VA awarded AME a contract for 10 million gloves, emphasizing that the delivery date was June 7, 2021, for all contracted-for gloves and that *"[n]o extensions w[ould] be granted. . . . includ[ing] . . .* [for] *delays associated with the manufacturer, the supplier, shipping delays, customs,* lack of financing and *the pandemic." Decision I* at 350 (emphases in original); J.A. 2192.

On May 25, 2021, AME informed the VA that a shipment containing all the gloves was expected to arrive in New York on June 1 and would be shipped to the delivery site within 3–4 days. *Decision I* at 352; J.A. 2254.  On June 2, however, AME indicated that 75 percent of the shipment was set to arrive in New York on June 9 instead and that the remaining 25 percent of the shipment was expected to arrive on June 22.  *Decision I* at 352; J.A. 2251.  On June 8, having received no gloves from AME, the VA informed AME that it had terminated its contract for cause for failing to meet the delivery deadline.  *Decision I* at 352–53; J.A. 2268–70.

## C.

On February 16, 2021, Servant submitted a quote to supply 50 million gloves. *Decision II* at 220; J.A. 213–15, 220–21.  The following month, on March 11, the VA awarded Servant a contract for 50 million nitrile gloves to be delivered by April 26, 2021, emphasizing to Servant that "[n]o extensions w[ould] be granted. . . . includ[ing] . . . [for] delays with the manufacturer, the supplier, shipping

delays, customs, and the pandemic." J.A. 352; *see also Decision II* at 221.

On April 22, 2021, four days before the delivery deadline, Servant reported that because of delays at "California ports" due to the "Suez Canal issue," only partial delivery would arrive the following day, and the remaining portion would ship out within about a week. *Decision II* at 222; J.A. 417–18. On April 25, Servant provided a schedule update, offering two alternative proposals to finish delivering the 50 million gloves by either May 7 or May 28 with a corresponding discount to the VA depending on the delivery date. *Decision II* at 223; J.A. 438–41. Servant also cited the "supply-chain crisis" due to the global pandemic as a reason for its alleged "excusable delay." *Decision II* at 223; J.A. 439.

On the day of the delivery deadline, April 26, 2021, the VA learned that it had received a partial delivery from Servant, but the packaging of the delivered gloves did not match Servant's submission. *Decision II* at 223–24; J.A. 521–75. On May 5, 2021, the VA terminated Servant's contract for cause. *Decision II* at 226; J.A. 830–31.

D.

On February 9, 2021, Noble submitted a quote to supply 50 million gloves from several brand names. *Decision II* at 226; J.A. 998, 1004, 1058, 1125. The VA informed Noble on March 19 that only the mCare gloves by Mercator Medical had passed the technical evaluation. J.A. 1231–33; *Decision II* at 226. Noble confirmed that it was able to supply 25 million mCare gloves by Mercator Medical. *Decision II* at 226; J.A. 1230–31. Noble also provided the VA with other documentation, including an authorized distributor letter for Mercator Medical mCare products, an OEM verification letter, photographs of the boxes of offered gloves bearing mCare labels, and confirmation that the boxes met FDA labeling guidelines. *Decision II* at 226; J.A. 1241, 1258–64.

On April 22, the VA indicated that it planned to award Noble a contract for 25 million Mercator Medical mCare gloves, to be delivered by June 10, 2021. *Decision II* at 226–27; J.A. 1362. The VA also stated that "[g]love boxes to be delivered shall match the ones submitted in [the] submission," and that glove substitutions would not be allowed. *Decision II* at 227; J.A. 1362. The VA finalized the contract award to Noble by April 23. *Decision II* at 227; J.A. 1373.

The VA received shipments from Noble in mid-May. *Decision II* at 228; J.A. 1407–09. The shipments contained gloves with packaging that was not previously disclosed in Noble's quote, with some boxes bearing "UniSpace Health" as their brand, and others bearing the mCare brand but having different product numbers than those required by contract. *Decision II* at 228; J.A. 1420–48. In response to the VA's inquiry, Noble claimed that "Unispace and Nitrylex are mCare" and that "Mercator has recently beg[u]n to replace the mCare line to Nitrylex and Unispace." *Decision II* at 228; J.A. 1449. Noble also stated that going forward, the VA would receive "a mixture of mCare boxes, Nitrylex boxes, and Unispace boxes." *Decision II* at 228; J.A. 1456.

On May 20, the VA issued a cure notice because of Noble's "inability to deliver the awarded nitrile gloves," noting that Noble had delivered and planned to continue to deliver gloves different from those awarded. *Decision II* at 228; J.A. 1465–66. On May 25, 2021, the VA terminated Noble's contract for cause. *Decision II* at 228–29; J.A. 1487–89.

E.

On January 12, 2021, Transcendence submitted a quote to supply 50 million gloves from Medivico Health Solutions. *Decision II* at 217–18; J.A. 1623–24, 1672–73, 1676–77. On January 22, 2021, the VA awarded Transcendence a contract for 50 million Medivico gloves to be delivered by March 8, 2021. *Decision II* at 218; *see also* J.A. 1746–53.

Four days before the delivery deadline, on March 4, Transcendence informed the VA that there was a delay and offered to supply a substitute glove with a delivery date to be determined. *Decision II* at 219; J.A. 1811–13; *see also* J.A. 1815–34. The VA responded that it was "possibly willing to grant a short extension" but that "substitutions [we]re not permitted." *Decision II* at 219 (citation omitted); J.A. 1835. On March 5, Transcendence updated the VA that Medivico was "unable to fulfill [its] obligation to [Transcendence] due to the current state of the PPE market" and offered to substitute with yet another brand of gloves. *Decision II* at 219; J.A. 1840–41; *see also* J.A. 1842–44. The VA ultimately terminated the contract for cause on March 9, 2021. *Decision II* at 219–20; J.A. 1861–63.

### F.

AME, Servant, Noble, and Transcendence all challenged the VA's terminations for cause at the Court of Federal Claims, seeking to convert them into terminations for convenience and requesting monetary damages. *Decision I* at 347; *Decision II* at 214. The Court of Federal Claims granted the government's motions for summary judgment and denied the Plaintiffs' cross-motions for summary judgment. *Decision I* at 347, 360; *Decision II* at 214, 240.

The Appellants timely appeal. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. STANDARD OF REVIEW

"We review a grant of summary judgment by the Court of Federal Claims de novo." *FastShip, LLC v. United States*, 892 F.3d 1298, 1302 (Fed. Cir. 2018) (internal quotation marks and citation omitted). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting RCFC 56(a)). "Contract interpretation is a question of law, which we

review de novo." *Nova Grp./Tutor-Saliba v. United States*, 87 F.4th 1375, 1379 (Fed. Cir. 2023).

"The level of discretion that must be exercised by the government before terminating a contract for default is a question of law, which we review *de novo*." *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1325 (Fed. Cir. 1999). "The contracting officer has broad discretion to determine whether to terminate a contract for default and we will only overturn that decision if it is arbitrary, capricious or constitutes an abuse of discretion." *Consol. Indus., Inc. v. United States*, 195 F.3d 1341, 1343–44 (Fed. Cir. 1999) (internal quotation marks and citation omitted).

## III. DISCUSSION

On appeal, the Appellants argue that the Court of Federal Claims erred by finding that (1) the Appellants did not show that the delays were excusable, *see* Appellants' Br. 43–45; (2) the Appellants breached the contracts by delivering or offering to deliver different products from those specified under the contract, *see id.* at 41–43, 49–54; and (3) the contracting officer did not abuse his discretion or breach the duty of good faith and fair dealing. *See id.* at 31–40. Regarding AME only, the Appellants also argue that the Court of Federal Claims impermissibly relied on AME's pre-award characteristics. *See id.* at 46–49. We address each argument in turn.

### A.

The Appellants first argue that the Court of Federal Claims should have found that the delays in delivering the gloves by AME, Servant, and Transcendence were excusable because the delays were caused by the pandemic and its effect on common carriers. *See* Appellants' Br. 44–45,

45 n.19.[2]  The Appellants contend that the finding by the Court of Federal Claims to the contrary is based on an incorrect interpretation of *United States v. Brooks-Callaway Co.*, 318 U.S. 120 (1943).  *Id.* at 44–46.  We disagree.

The Court of Federal Claims found that the VA's termination decision was based on the failure of AME, Servant, and Transcendence to deliver the contracted-for gloves by the contractual deadlines.  *Decision I* at 355 (AME); *Decision II* at 231–32 (Servant and Transcendence).  On appeal, the Appellants do not challenge these findings.  Thus, the government has satisfied its prima facie burden of showing default.  *Gen. Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363 (Fed. Cir. 2008) ("A contractor's failure to make timely delivery of agreed-upon goods establishes a prima facie case of default.")*, opinion supplemented on denial of reh'g*, 527 F.3d 1375 (Fed. Cir. 2008).  The burden thus shifts to the Appellants to show that the failure to timely deliver the gloves was excusable.  *Id.* at 1363.  To avail themselves of the excusable delay provision, the Appellants must show that the failure to deliver is "caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence."  *Id.*; FAR 52.212–4(f).

The Appellants raise various unsupported arguments to allegedly support their excusable delay claims.  AME argues that its shipping containers were originally scheduled to arrive in New York on June 1, but the containers were delayed because of "operational reasons" on behalf of the shipping company.  J.A. 2251.  However, AME identifies no documents in the record to show that the delivery was

---

[2]    The excusable delay argument is not applicable to Noble, because the Court of Federal Claims' findings on excusable delays were limited to AME, Servant, and Transcendence, and the Appellants did not argue otherwise. *See Decision I* at 356–59; *Decision II* at 234–36.

scheduled to arrive in New York on June 1 in the first place, and AME has not provided any additional documentation. J.A. 2260–64; *see also Decision I* at 358. Similarly, although Servant claims that the delays were due to the "Suez Canal issue . . . and other extenuating global market conditions" related to the pandemic, J.A. 417–18, the shipping documents cited by Servant as support appear to be bills of lading including only domestic information, which do not support Servant's claim of international shipping delays caused by the pandemic. J.A. 420–27; *see Decision II* at 235–36. Transcendence primarily relies on an email and accompanying letter generally stating that Medivico, its supplier, was "unable [to] fulfill their obligation to [Transcendence] due to the current state of the PPE market." J.A. 1840, 1842. Such generalized assertions cannot raise a genuine dispute of material fact. *See Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1343 (Fed. Cir. 2016) ("[A]mbiguity and generality cannot create a genuine issue of material fact*."*). Therefore, we conclude that the Appellants fail to raise a genuine dispute of material fact concerning whether the delays were excusable.

The Appellants argue that the Court of Federal Claims erred by misapplying *Brooks-Callaway*. Appellants' Br. 43–46; *see also Decision I* at 359; *Decision II* at 236. They contend that the COVID-19 pandemic was different from the type of pandemic where the Supreme Court in *Brooks-Callaway* cautioned against applying excusable delays, noting that the logistical challenges brought by the COVID-19 pandemic were unpredictable and unforeseeable. Appellants' Br. 45–46. But this argument misses the mark. Even accepting the Appellants' argument that the COVID-19-related delays are the type of delays that can be excusable, they still fail to present sufficient evidence to show a genuine dispute of material fact. Therefore, the Court of Federal Claims did not err in finding the delays by AME, Servant, and Transcendence were not excusable.

## B.

The Appellants then argue that the Court of Federal Claims erred in finding that Servant and Noble delivered substitute items, rather than conforming goods. Appellants' Br. 49–51. The Appellants additionally contend that even if Servant and Noble delivered substitute gloves and Transcendence submitted substitute product proposals, they met the criteria for showing permissibility of substitution during performance. *Id.* at 51–53. According to the Appellants, the contracting officer's rejection of substitution was thus an abuse of discretion. *Id.* at 53–54. We are not persuaded.

At the outset, we need not reach these arguments pertaining to Servant. Even if the government had accepted Servant's gloves with a different packaging, treating them either as contracted-for gloves or acceptable substitutes, Servant would still have failed to timely deliver the contracted-for quantity of gloves. *See* J.A. 438–41 (Servant proposing to deliver all gloves by May 2021, after the April 26 contract deadline); J.A. 442–43 (same). As discussed above, the government had sufficient basis to terminate for default solely based on Servant's delay and inability to show that the delay was excusable.

We are not persuaded by the Appellants' argument that Noble provided conforming, rather than substitute goods. Appellants' Br. 49–51. Noble does not dispute that the delivered gloves bore different brands or different part numbers than those specified in the contract. *Decision II* at 232; *see also* Appellants' Br. 50 ("[T]he only perceived difference was the packaging."). *Compare* J.A. 1442–48 (emails and photographs of delivered Noble gloves), *with* J.A. 1380 (description of contracted-for mCare gloves including part numbers). Noble provided an email from Mercator Medical stating that "the specs are exactly the same," J.A. 1473, but fails to provide documentation to substantiate this conclusory statement. Noble also provides a

screenshot from the FDA website that does not even mention Unispace, let alone support Noble's argument. J.A. 1451. Given the apparent differences in packaging, there is no genuine dispute of material fact concerning whether these gloves were in fact substitutes.

The Appellants' argument that Noble and Transcendence met the criteria for showing permissibility of substitution is also unpersuasive. Appellants' Br. 52–54. Specifically, the Appellants point to the "Brand Name or Equal" statement in the mandatory technical requirement part of the solicitations as evidence that substitution should have been allowed. Appellants' Br. 52–53; *see also, e.g.*, J.A. 155; 1561. We disagree. Although the cited language in the mandatory technical requirement table suggests that the VA was open to accepting quotes offering various brands of products if they met the specified technical requirements at the solicitation stage, it does not indicate that substitutions are still allowed once the VA has accepted a quote for a particular product. Indeed, the solicitations also explain that contracts are "awarded based on submitted quotes," and that the submitted quote must include a variety of documentation showing that the "*the item(s) being quoted* meet or exceed the mandatory technical requirements." J.A. 155–56 (emphasis added); J.A. 1561–62 (emphasis added). Moreover, the solicitations include instructions for offerors to provide "details for each quoted glove" in a spreadsheet. J.A. 156; J.A. 1562. On the signed contracts, the price/costs schedules identify the OEM and part numbers for the contracted-for gloves, not just any brand-name equals. J.A. 1376, 1380 (Noble); J.A. 1672–77 (Transcendence). Taken together, these different parts of the contract support interpreting the "brand name or equal" language to only allow substitution at the solicitation stage. *See NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("When interpreting the contract, the document must be considered as a whole and

interpreted so as to harmonize and give reasonable meaning to all of its parts.").

The cases cited by Appellants, such as *Jack Stone Co. v. United States*, 344 F.2d 370 (Ct. Cl. 1965) and *Sherwin v. United States*, 436 F.2d 992 (Ct. Cl. 1971), are distinguishable. Appellants' Br. at 52–53. In both cases, our predecessor court held that the government erred by not allowing substitutions when the contracts include provisions explicitly authorizing the contractor to make substitutions equal to the items specified. *Jack Stone*, 344 F.2d at 373–74 (contract stating that the contractor "may make substitutions equal to the items specified if approved in advance in writing by the Contracting Officer"); *Sherwin*, 436 F.2d at 999 (stating that "the Contractor may, at his option, use any equipment, material, article, or process which, in the judgment of the Contracting Officer, is equal to that named"). Here, the Appellants have failed to point us to similar contract language.

Even if the contracts allow for substitution, Noble and Transcendence still fail to show that there are genuine disputes of material fact. Both contracts state that the contractor has the burden to provide documentation to support that the gloves quoted meet or exceed mandatary technical requirements, including an "Authorized Distributor Letter" on the OEM's letterhead stating that the quoter is authorized to distribute the specific product(s) proposed or stating generally that "the quoter is an authorized distributor for all the manufacturer's products." J.A. 1377 (Noble); J.A. 1673 (Transcendence). They also require OEM product specifications, OEM product literature with supporting certifications and test reports, and clear and readable photographs of the nitrile glove boxes and gloves being proposed. J.A. 1378 (Noble); J.A. 1667, 1674 (Transcendence).

As the Court of Federal Claims found, Noble failed to provide any product literature, specifications, or "technical

capabilities" for the delivered gloves other than an assertion by Mercator Medical that the "specs are exactly the same." *Decision II* at 239; J.A. 1473. Transcendence also failed to provide sufficient documentation for its proposed substitutes. For example, Transcendence's supplier letters for the proposed substitutes were not from the OEM and fail to clarify its supply chain. J.A. 1833–34 (providing a letter from ATX Capital Management representing itself as "*either* the Manufacture[r], Authorized Distributor, Authorized Sub Distributor or Title Holder" without specifying its role (emphasis added)); J.A. 1843–44 (providing a letter from its supplier PharmacyGo without specifying the OEM); *see also Decision II* at 238–39.

Because Noble and Transcendence did not provide adequate documentation required by the contracts, the VA did not err in rejecting the substitutes even if substitutions were allowed. *Decision II* at 239. Therefore, we also reject the Appellants' argument that the contracting officer abused his discretion by rejecting the proposals for substitute by Noble and Transcendence.

For the reasons above, the Court of Federal Claims also did not err in finding that Servant and Noble delivered substitute items, rather than conforming goods. The Court of Federal Claims also did not err in upholding the VA's rejection of the substitutes by Servant and Noble.

### C.

The Appellants also argue that the Court of Federal Claims should not have relied on AME's pre-award characteristics in upholding the VA's termination of AME's contract for cause. Appellants' Br. 46–49. This argument is also unavailing. Although the Court of Federal Claims did include a lengthy fact section outlining AME's efforts to receive Small Business Administration documentation pre-award, *id.* at 47 (citing *Decision I* at 349–50), nothing in the court's discussion section indicates that it found AME untrustworthy on that basis. Moreover, contrary to the

Appellants' argument, the Court of Federal Claims did not insinuate that AME had misrepresented its initial port delivery date. *See id.* at 48 (discussing *Decision I* at 358–59). Rather, the Court of Federal Claims merely explained that AME failed to provide documentation substantiating its claims of excusable delay. *Decision I* at 358–59. Therefore, we conclude that the Court of Federal Claims did not err in discussing AME's pre-award characteristics.

### D.

Lastly, we reject the Appellants' arguments that the contracting officer intentionally evaded exercising discretion and breached the duty of good faith and fair dealing. Appellants' Br. 30; *see also id.* at 31–40.

First, the Appellants contend that the contracting officer abused his discretion by structuring the solicitation in a way that effectively removed any instance of excusable delay. *See id.* at 32–33. But they failed to raise this argument before the Court of Federal Claims. *See* Pl.'s Summ. J. Br. 19–30, *Am. Med. Equip., Inc. v. United States*, No. 21-1553C (Fed. Cl. Feb. 23, 2022), Dkt. 15; Pls.' Summ. J. Br. 33–40, *Servant Health, LLC v. United States*, Nos. 21-1373C, 21-1456C, 21-1472C (Fed. Cl. Mar. 23, 2022), Dkt. 43. Instead, the Plaintiffs argued that there were no performance-based reasons for default termination, but instead that it was pretextual; the Court of Federal Claims rejected that argument. *Decision I* at 354 n.5; *Decision II* at 230 n.17. The Appellants' new argument on appeal is therefore forfeited. *See Cal. Ridge Wind Energy LLC v. United States*, 959 F.3d 1345, 1351 (Fed. Cir. 2020) ("We may deem an argument forfeited when a party raises it for the first time on appeal."). Because any protest to the strict deadline requirements of the solicitation is forfeited, the Appellants' argument that the contracting officer did not exercise discretion by not granting extensions cannot succeed.

The cases cited by the Appellants are inapposite. Appellants' Reply Br. 2–4 (first citing *Schlesinger v. United States*, 390 F.2d 702 (Ct. Cl. 1968); and then citing *Darwin Constr. Co. v. United States*, 811 F.2d 593 (Fed. Cir. 1987)). In *Schlesinger*, the court concluded that the "record *affirmatively shows* that nobody . . . . exercised the discretion they possessed." 390 F.2d at 709 (emphasis added). In *Darwin*, the court held the termination to be an abuse of discretion because "the default action was taken solely to rid the Navy of having to deal with" the contractor. 811 F.2d at 596. In both cases, the default served only as a useful pretext for the termination of the contract. *Id.*; *Schlesinger*, 390 F.2d at 709. Here, there is no evidence, beyond the Appellants' conclusory statements, that the Appellants' failures to deliver the requested gloves on time were merely a useful pretext for the terminations.

The Appellants also contend that the contracting officer acted in bad faith. Appellants' Br. 38–40. But the Appellants concede that the contracting officer ensured that "the bidding contractors knew the ramifications of failing to deliver within 45 days." Appellants' Br. 38–39 (first citing J.A. 2361; then citing J.A. 1491–95; and then citing J.A. 2364–66). Since the contractors were on notice of the strict deadline, the Appellants' assertion that the contracting official acted in bad faith by "creat[ing] a trap for contractors" is without merit. *Id.* at 39. We also reject the Appellants' unsupported assertions that the contracting officer "took pleasure in terminating for default," *id.*, and that the termination was in bad faith because "the government would have suffered no negative consequences through the allowance of extensions." *Id.* at 40. Therefore, we conclude that the Court of Federal Claims did not err in finding that the contracting officer did not abuse his discretion and did not act in bad faith.

## IV. CONCLUSION

We have considered the Appellants' remaining arguments and find them unpersuasive. For the foregoing reasons, we *affirm* the judgments of the Court of Federal Claims.

## AFFIRMED